Mr. O'Reilly, we're back to you. You have ten minutes. Thank you, Your Honor. Your Honor, I'm going to focus my last minutes talking about the 20 pictures. Those are the first 20 pictures made by Content Philosophy about copyright law and about comedy. And for the respect for proceedings in other countries. So I'm going to give you a little bit of the history. And maybe you're familiar with it, maybe you're not. But I ask you to bear with me. In 1993, Content Philosophy died, as you probably know. Mario Moreno filed his lawsuit in Mexico, seeking to establish that he succeeded to the copyrights. The only party to contest that was Eduardo La Parra, who claimed that he was the sole owner. I need my water. Columbia didn't get involved in the case. But the bigger problem is Columbia had never recorded any kind of ownership of copyright in Mexico. It had made no claim to ownership of a single film. There was nothing that prevented La Parra and the estate from litigating their ownership claim in Mexico. The estate won that lawsuit. It was then in 1996, or in 1997, that La Parra filed the same lawsuit here. Exact same lawsuit, asking to be declared the owner of all of the films. Columbia counterclaimed to that lawsuit. And that's the lawsuit that underlies this whole thing today. It claimed that under various agreements, and these were its words, it acquired the right to distribute 39 of the Content Philosophy films. That was the extent of its claim. Never claimed that a British company owned a single film. Never claimed that it owned a single film. Never made a single claim that was inconsistent with the estate's ownership of the Mexican copyrights of the film. At that point, the case got a little crazy. La Parra said that the Mexican judgment didn't bar him from relitigating ownership in Mexico. On August 28th, Judge Ray stayed the entire action. And he ordered La Parra to return to Mexico to relitigate the issue that had previously been litigated in the Mexican courts. That was ownership of the Content Philosophy films. Now, at this point, there had been about four months of briefing before Judge Ray, and everyone was aware that what had been resolved, or what had been litigated in the previous lawsuit, was sole ownership of the Content Philosophy films. La Parra did return to Mexico, and that's the action that's going on right now. He filed the same action, claiming to be the sole owner, just as Judge Ray directed him. On May 23rd, he served Columbia. Columbia answered and filed its own claim in Mexico, claiming that it was the owner of the films. It didn't lodge a single contract that it relies upon in this court. It claimed that it was the owner, and it's proof it submitted a bunch of copyright registrations from the United States that had been illegally obtained and that were in the process of being revoked. I've covered it more in my briefing, but Columbia doesn't contest that those certificates were revoked, that they falsely represented that the films were unpublished, and that they were unpublished works. There were a variety of problems with those copyright registrations. It was while the estate was defending against Columbia's claim, based upon those fraudulent U.S. registrations, that the estate perfected its own copyright registration in Mexico. It recorded with the Copyright Office the original signed agreements whereby Continflas and Gelman dissolved posts of films, with Gelman getting cash and Continflas getting the derecho de autor to the movies. It then proved to both Judge 18 of the Mexican court and to the Instituto del Derecho de Autor that it had succeeded to Continflas' right through his last will and testament. It applied for and it was issued copyright registrations by the Mexican Copyright Office. It's got to be reiterated that all of this was going on while Columbia was pursuing an ownership claim in Mexico, based entirely upon falsely obtained and fraudulent U.S. copyright registrations. It's at this point that I got involved in the case. While I was in the process of trying to obtain the file from the Mexican case, Columbia went to Judge Ray, sought an emergency injunction against the Mexican proceedings. And again, these are the proceedings that are going on now. By the time I received the file, I pointed out to Judge Ray that Columbia had filed a series of revoked registrations, Columbia had committed a fraud on the Mexican courts, do not rescue Columbia from its fraud. Judge Ray tried to stay portions of that Mexican case. The Mexican court refused to stay any portions of it, so Columbia was in a fix. It made a deal with La Parade, it paid off La Parade. La Parade dismissed Columbia from the lawsuit. Columbia also dismissed all of its claims to ownership of the Continflas films. Columbia has forever given up its rights to go back to Mexico and to seek a declaration from a Mexican court that it owns these films. Instead, Columbia's horse in the race in Mexico is La Parade. If La Parade wins pursuant to a stipulated judgment between Columbia and La Parade, La Parade's rights go to Columbia. That's the only way Columbia is going to ever acquire Mexican copyright. Now fast forward to this case. After Columbia fled Mexico, it reinstituted this lawsuit that had been stayed for years. It was here for the first time that Columbia claimed that Columbia Pictures Corporation, this British corporation, was the owner of 20 of the pictures based on the 1960 unsigned contract. Columbia claimed that the court had jurisdiction over this new lawsuit based upon the stipulated judgment. Your Honor, Columbia Pictures Corporation Limited wasn't a party to the stipulated judgment, and the ruling that eventually came forth that Columbia Pictures Corporation Limited owned the films outright ended the stipulated judgment. Columbia has never paid a penny under the stipulated judgment again. Permitting Columbia to pursue that claim extinguished the stipulated judgment. Another major problem was that Columbia, this British corporation, wasn't a party to the case. I repeatedly warned Columbia that it could not pursue claims on behalf of a British corporation that was not before the court. I sought dismissal of the action based upon the following principle from Wright and Miller. A general power of attorney for the convenience of the parties does not create a sufficient interest or right in the lawsuit, and the grantor remains the only real party in interest. After Columbia Pictures rested its case, it then obtained a transfer of rights from this British corporation. This was then allowed into evidence over my objection, but the motion to dismiss has not been ruled upon, and I asked the court to dismiss Columbia's claim based upon the fact that it pursued the action on behalf of a British corporation that was not before the court. But beyond all of this, Your Honor, Columbia obtained a very tainted judgment from Judge Ray. On behalf of this British corporation, it did it so that it could enjoin the estate's copyright activities in Mexico. All Mexican copyright law was excluded from this trial. All evidence of the Mexican judicial proceedings was excluded. All of the estate's copyright registrations, all of the recordations that it had made in the Mexican Copyright Office were excluded. Excluded from the trial was the testimony of the subdirector of Mexico's Copyright Office, who was going to come here and testify regarding the content of Mexican law. Under this very, very rigid and structured trial that Mr. Tashman orchestrated, Judge Ray ruled that the British corporation was the common law owner of the films, and we all know about that. Your Honor, whether the court had jurisdiction to issue that ruling, its error and its clear error was when it used that ruling to enjoin the copyright activities in Mexico. As the Mexican government urges in its amicus brief, this is an intrusion upon the copyright policies in Mexico, and it's an intrusion upon its sovereignty. In Mexico, unsigned contracts, copyright transfer contracts are not enforceable. Permanent transfers of copyright for no consideration, which was what the 1960 contract was, those are not permitted under Mexican Federal Copyright Law. There are very strict limitations on your ability to assign copyright under Mexican Copyright Law. Of course, under Mexican Copyright Law, recorded transfers of copyright prevail over unrecorded transfers. The recorded transfer can be impugned, but it has to be done in the federal courts of Mexico. Columbia was always, always capable of taking its 1960 contract and bringing it to the right court, the Mexican court, and saying, this gives us a superior right than the recorded transfer that the estate made. The other issue on policy consideration is that registrations issued by Mexico's Instituto del Derecho de Autor are conclusive, unless they are invalidated by a Mexican federal court in an action where the instituto is joined as a party. Conclusive of what? Conclusive of what? What issue are they conclusive of? I said they are conclusive. Right. It conclusively establishes ownership. It does. Yes. Okay. And I don't think anyone disputes that. Well, as compared to United States law where it's only presumptive. In United States law, it is presumptive, Your Honor. But if you want to invalidate a United States copyright, then the place to do it is in the United States court, not in a Mexican court, not in a Philippine court. Yes, it is conclusive, except that Columbia could have gone to Mexico. But it should have gone to Mexico to fight it. Your time is up. Thank you, Mr. Riley. Mr. Tashern, you have 15 minutes to respond to this part of the case and also to argue the cross-appeal. Thank you, Your Honor. I'd like to reserve five minutes. Judge Ray wisely excluded all of almost all of Mr. Riley's statements as to what happened in Mexico, the significance of what happened in Mexico. So there's really no admissible evidence at trial to support Mr. Riley's long narrative. We dispute almost all of it, and we hope that the court would not pay any attention. Columbia did nothing wrong in Mexico, and what happened in Mexico has no bearing on this appeal. The decisions in Mexico are not res judicata. The cases are ongoing. Columbia was not a party to any of those proceedings. Columbia also disagrees with Mr. Riley's characterization of Mexican law. It is completely false. And we would urge the court that other than the issue of authorship, which was decided by Judge Ray in the first trial phase, that it not base any of its rulings on Mr. Riley's statements regarding Mexican law. For one, we believe that there's no requirement that copyrights or transfers have to be registered. And at best, under Mexican law, it's entitled to minor weight and no weight as between parties who are in privity. If the court believes that Mexican law has any relevance other than the issue of authorship, we would request a remand to the district court to determine these complicated issues. As to the real party and interest issue, Columbia believes that this claim was waived by Ivanova's failure to raise it on his prior appeal of the preliminary injunction. That appeal was filed mid-trial after the close of discovery, and there is no basis for Ivanova's argument in his brief that he was not aware that the wrong party, or allegedly the wrong party, was in the case. Columbia, during discovery, made full disclosure, both in terms of interrogatories and documents, as to the chain of title. Columbia produced a very broad power of attorney, which gave Columbia Pictures Industries, Inc. all rights to act in the name and stead of Columbia Pictures Corporation Limited. That's the sister corporation that Mr. Riley is talking about. He doesn't mention that it's a sister corporation. The British Corporation. It is a British corporation, but a sister corporation of Columbia Pictures, the plaintiff in this case. And since 1988 or earlier, there was a very broad power of attorney granting Columbia to act in its name and stead, which we believe is sufficient. It may not be sufficient to bring a copyright infringement claim. There are some recent rulings in the circuits on that issue. But here we do not have a copyright infringement claim. We have a contractual claim, and we believe that the power of attorney was sufficient. In addition, since Mr. Riley, in the middle of trial, finally brought a motion to dismiss for failure to join the real party in interest, Columbia documented what was the reality for decades, and that was that after Columbia's U.K. subsidiary obtained the rights to the pictures in 1960, it was transferred to Columbia, and Columbia has been exploiting those pictures for the past several decades. And the non-proton written assignment demonstrates that. And we would also say under the court's decision in Magnuson, when the grantor and the grantee are in agreement as to the validity of an assignment, that a third party lacks standing to challenge. In any event, the remedy for failure to join the real party is to permit that party to intervene. So the argument really has very little, if any, merit. This is a question out of just curiosity, but does Mexican copyright law have a term or duration? Yes, it does. When parties in the United States talk about purchasing or acquiring rights in perpetuity, intellectual property lawyers mean that that's a shorthand for the term of copyright and all extensions, and et cetera, et cetera. We understand that copyrights are not perpetual, and the same is true in Mexico. Perpetual rights weren't transferred. The only thing that was transferred were all rights for the term of copyright protection. Mr. Riley, I'm sorry. That's going to expire at some point. What point is that? Many years from now, Your Honor. All right. Mr. Riley says that all Mexican evidence was excluded during the second trial phase. That's not correct. Judge Ray admitted two Mexican copyright certificates, and these were the only two Mexican certificates that Ivanova produced under Rule 6, that he produced in discovery, that he listed on his trial exhibit list, that his experts mentioned in their Rule 26 report, and that were mentioned or produced in connection with the Mexican expert depositions. And these two Mexican filings were the filings of the two contracts from which Cantinflas allegedly acquired all rights in the motion pictures from the Mexican producers. And the two copyright certificates to which these two transfer agreements were attached clearly stayed on their front, that the Copyright Office considered the validity of the two transfers to be indeterminate. So the only evidence that Ivanova had produced in discovery and listed on his trial exhibit list, on Mexican copyright law, were these two Mexican copyright certificates based upon the two transfers which the Mexican Copyright Office found, did not rule, were valid. Now, Judge Ray, after hearing days of testimony and reviewing scores of documents, found that these copyright certificates, the two underlying transfer documents, were not credible or reliable, so they were fake. Speaking of Judge Ray's findings and such, you requested disgorgement, right? Yes. Judge Ray apparently didn't address it, but why shouldn't we conclude that he implicitly found it in his discretion, not something he wanted to do? Well, I'm not sure it was an oversight, and we're not saying that it's an oversight. The case law suggests, actually holds, that if the court does not rule on the request, that the standard of review is de novo, so we would urge the court to use that standard. But even under the abuse of discretion, we would argue that it was an abuse of discretion for Judge Ray not to order disgorgement. Judge Ray found that Ivanova has no rights in these pictures and that Columbia owns 26 of the pictures. Ivanova testified that he had a deal with the Mexican television station Televisa and granted them an option to sell Columbia's pictures to Televisa for a million dollars, and Columbia requested that since Ivanova was selling to Televisa something that belonged to Columbia, that as a matter of fundamental justice, he should require Ivanova to disgorge that money to Columbia. When Judge Ray made his ruling and made no mention of the disgorgement claim, you folks didn't come back with a motion for reconsideration, anything like that, and say, hey, look, you forgot the disgorgement? Well, I don't know if he forgot it or not. Whatever he did, you didn't bring it to his attention that it wasn't addressed. That's correct. What significance do we attach to that? I don't think any. Both sides submitted very lengthy pretrial papers. Both sides submitted very lengthy findings of fact and conclusions of law. Judge Ray adopted many of our findings and conclusions of law. He didn't adopt others, and I don't think there's any obligation when a judge fails to adopt all of your conclusions of law that you have to bring a motion for reconsideration. We don't think that there was any new law or new facts that we could bring before him. We had made our arguments, and apparently he declined to address them. Any reason you can't pursue disgorgement in Mexico? Excuse me? Any reason you couldn't pursue disgorgement in Mexico? I just don't know the answer. We haven't looked into Mexican law. Okay. You said you wanted to reserve five minutes. Thank you, Your Honor. Judge Thompson has a question. Well, we're on the subject of misstatement. At the time that Ivanova was apparently on Mexican television announcing this million-dollar deal, at that time, Judge Ray had determined that Colombia owned all these pictures. No, I think the press conference, which I didn't see but Ivanova testified to, was held prior to Judge Ray's determination. Okay. Now, so Ivanova sells for a million bucks the rights to distribute these pictures. Actually, an option to. An option. Okay. As it turns out in Ray's court, Ivanova really didn't have those ownership interests that it purported to sell. Now we've got Televisa that's paid a million dollars for something that Ivanova really didn't have much right to be selling. Isn't that Televisa's problem? Well, Televisa might have made that claim, but it was sued in Mexico and didn't make that claim, and that case has been dismissed for lack of prosecution. I tell Mr. Kelly that I'm going to sell him your beautiful suit for $1,000, and he pays me $1,000 for your suit, and I don't have any right to sell it. The problem is that Televisa has no injury because Colombia sold the pictures to Televisa for the strike price in the option. So Televisa has not suffered any damage. Yeah, but my point is, did Ivanova do anything wrong? I mean, why should Ivanova have to disgorge a profit? Because Ivanova sold rights that belonged to Colombia, so Colombia should get the money. Well, later it turned out, but this is the buyer's problem, it seems to me. They made the wrong person. That's true, but the buyer wasn't damaged because Colombia followed through with the original option. But Ivanova didn't own the rights. The court subsequently determined that they were Colombia's rights. It's really inequitable to permit him to retain the money. Now, Ivanova has never argued, either in this court or in the district court, that the reason why Colombia shouldn't get the money is that it really belongs to Televisa. This is really an argument that the court has raised for the first time. Televisa cannot make a claim because it suffered no damage, because Colombia fully performed and it got what it bargained for, and it's unfair for Ivanova to retain that money because he simply does not own the motion pictures. You said you wanted to reserve time. I'll reserve the balance. Thank you. Mr. Riley, back to you. Your Honor, the press conference where Televisa and my client announced the agreement was January 18, 1998, or the 19th, one of those two days. At that point, Colombia was pursuing its claim in Mexico that it owned the copyrights to the films based upon those revoked copyright certificates. Colombia should have, if it felt there was something improper, sought an injunction in Mexico at that time. Instead, it tried to force Televisa not to contract with the estate. The estate and Televisa sued Colombia to try to resolve the issue in Mexico. That claim was eventually dismissed because Televisa agreed to go ahead and pay us. But Colombia had every opportunity to stop us in Mexico, to obtain an injunction in Mexico. But, Your Honor, the problem was is that we are, at that time, we had prevailed in the first Mexican lawsuit. We had recorded our registrations with the Copyright Office. We had obtained registrations. We were the copyright owner in Mexico. And they didn't have a basis. You're talking now about the time you made the million-dollar deal? At the time we made the million-dollar deal. Okay. I mean, we were the full copyright owner in Mexico. And Televisa doesn't go passing around money to people who don't have rights in films. There was a full inquiry, and that was covered on the record. Colombia met with Televisa people. Televisa met with us. They decided we had rights. Colombia's weren't valid. Now, if Colombia wants the million dollars, if they think that the estate didn't have the right to license those films in Mexico, it should go to the Mexican courts. And explain to the Mexican courts that it's the common law owner of the films is determined by a U.S. court, and that it thinks it has superior rights to distribute the films in Mexico, and ask for the money back. And that's, Your Honor, I mean, that's what this whole case comes down to. Are you going to do that? Well, I suppose that would depend on what that contract really was for the million bucks, whether Televisa bought what interest Ivanova had with knowledge that there was claims being asserted by Colombia. I don't know. Well, I mean, I think the record, the more detailed record is clear that the contract was called a promise of contract. Televisa didn't actually acquire any distribution rights, present rights. It acquired basically a promise for us that once Colombia's contracts expired, that we would license the films exclusively. Well, that depends upon somebody determining what that agreement really was between Televisa and Ivanova. And I guess you say that should be done in a Mexican court. It is, Your Honor. No distribution of any film has ever occurred under that contract. The million dollars was paid as a promise for a future contract. Now the whole thing has been tossed into disarray now. But no films have yet been distributed under that contract. All that Televisa acquired was a promise from us, the copyright holder, that once Televisa was under contract with Colombia, once those contracts expired, we would not give the rights to anyone else but Televisa. So we've earned the money, but we didn't sell any films to Televisa. Your Honor, the idea of a U.S. court in a case where all Mexican copyright law is excluded, issuing a common law ownership judgment, and then using that to try to Your Honor, that's just fundamentally wrong. And I'm going to read to you a quote from the Supreme Court case of Griffin v. McCoach. It is rudimentary that a State will not lend the aid of its courts to enforce a contract where to do so would violate the public policy of the State where enforcement of the foreign contract is sought. This has been cited in a number of cases, and it just makes sense. For a U.S. court to rule without looking at all at Mexican copyright law, Mexican copyright policy, that Colombia, this British entity, owned the films pursuant to an unsigned contract, that it acquired for no consideration, and that this gives the British Corporation ownership of the films, maybe a court can do that. And I think that's a really interesting exercise of rendering such a judgment. But when that court then uses that injunction to try to enjoin the Mexican copyright holder from engaging in protected activities in Mexico, Your Honor, I think that's where Judge Ray was clearly wrong. And I think that the ruling of the Supreme Court in Griffin v. McCoach in the citation of 313 U.S. 498 and the Supreme Court decision in Bond v. Hume, 243 U.S. 15, is 100 percent consistent with that principle. The United States courts should not have been trying to control copyright activities in Mexico in a trial conducted under U.S. common law. Thank you very much, Mr. Riley. We are going to the bottom of the ninth. Mr. Tashman, you've got about a minute and change. Thank you. Via a single set of contracts, Columbia acquired worldwide rights in a group of pictures. What Mr. Riley proposes, that in order to effect that grant, that Columbia must sue in every country in the world to effect its contractual rights. This is nonsense. The American court ---- Disney does it all the time. Excuse me? Disney does it all the time. I mean ---- For copyright infringement, Your Honor. Right. This is not ---- Isn't that ---- I'm sorry. I'm sorry. Isn't it so that it's if the films, present rights in the films were contracted away to, present rights to distribute the films were contracted away to Televisa, it would be infringement. If it was merely a promissory right after your contracts were over, it wouldn't be. Right. But what Judge Ray determined and what Columbia asked Judge Ray to determine is the validity of contracts that transferred copyrights. And these contracts were with Ivanova's predecessor in interest, Canton Floss. They were signed by Canton Floss. Ivanova is the estate of Canton Floss. So the parties are in privity. We are not suing someone for infringement. And I agree that the result might be different if we were suing for infringement. We are suing to enforce copyright rights on a worldwide grant of copyrights with parties with whom Columbia is in privity. We have personal jurisdiction. We have subject matter jurisdiction. The Court was correct in applying U.S. law using contractual choice of law principles, and the Court has the power to enforce its judgment under general principles which give the Court the power to enter extraterritorial injunctions. What the Court did was proper. What Mr. Riley proposes is unworkable, and we would urge the Court to affirm the lower court's rulings in all respects. Are there any questions? Thank you. Thank you. Our thanks to all three counsel. The cases just argued are submitted. Good morning. Thank you. All rise. Court is adjourned.
judges: Thompson, Silverman, Wardlaw